IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| CENTRAL IOWA BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL-CIO; CEDAR RAPIDS/IOWA CITY BUILDING TRADES COUNCIL, AFL-CIO; SCOTT SMITH, and WILLIAM GERHARD, <br><br> Plaintiffs, <br><br> vs. <br><br> TERRY E. BRANSTAD, GOVERNOR OF STATE OF IOWA in his official capacity as Governor of the State of Iowa; STATE OF IOWA; MIKE CARROLL in his official capacity as Director of Iowa Department of Administrative Services; IOWA DEPARTMENT OF ADMINISTRATION SERVICES; DAVID W. MILES, JACK B. EVANS, BONNIE J. CAMPBELL, ROBERT N. DOWNER, MICHAEL G. GARTNER, RUTH R. HARKIN, GRETA A. JOHNSON, CRAIG A. LANG and ROSE A. VASQUEZ in their official capacities as Members of the Board of Regents; BOARD OF REGENTS, STATE OF IOWA, <br><br> Defendants. | No. 4:11-cv-00202-JAJ-CFB <br><br> **ORDER** |

     This matter comes before the Court pursuant to Defendants' Motion to Dismiss filed on June 24, 2011. [Dkt. No. 8.] On May 3, 2011, Plaintiffs Central Iowa Building and Construction Trades Council, AFL-CIO; Cedar Rapids/Iowa City Building Trades Council, AFL-CIO; Scott Smith; and William Gerhard (collectively, "Plaintiffs") filed a complaint against the defendants, alleging violations of both federal and Iowa state law. [Dkt. No. 1.] The Defendants are Terry E. Branstad, Governor of the State of Iowa in his official capacity

as Governor of the State of Iowa; the State of Iowa; Mike Carroll in his official capacity as Director of the Iowa Department of Administrative Services; the Iowa Department of Administrative Services; David W. Miles, Jack B. Evans, Bonnie J. Campbell, Robert N. Downer, Michael G. Gartner, Ruth R. Harkin, Greta A. Johnson, Craig A. Lang, and Rose A. Vasquez in their official capacities as Members of the Board of Regents (collectively, "Members of the Board of Regents"); and the State of Iowa Board of Regents.

On August 10, 2011, Plaintiffs filed a response to the motion. Plaintiffs also filed a motion to voluntarily dismiss the state law claims of the Complaint (Counts III and IV); Plaintiffs' claims asserted against the State of Iowa, the Iowa Department of Administrative Services, the Board of Regents, and the State of Iowa; and Plaintiffs' claim for damages. [Dkt. Nos. 12 & 13.] Defendants filed a reply brief on August 24, 2011. [Dkt. No. 16.]

No party contends that there are factual disputes to resolve in order to adjudicate this motion. For the following reasons, the Court grants Plaintiffs' Motion to Dismiss [Dkt. No. 13] Counts III and IV without prejudice, Plaintiffs' claims asserted against the state actors, and Plaintiffs' claim for damages. The Court grants Defendants' Motion to Dismiss [Dkt. No. 8] Counts I and II.

## I. BACKGROUND[1]

This case concerns two specific construction projects that executed project labor agreements ("PLAs") and are affected by Governor Branstad's issuance of Executive Order #69 ("EO #69"). On January 14, 2011, Iowa Governor Terry E. Branstad issued EO #69, prohibiting the State and its political subdivisions from entering into PLAs on state-owned or state-funded construction projects. A PLA effectively unionizes an entire construction project because all union and non-union contractors must comply with certain union protocol and procedure. PLAs allow unions to represent all covered workers on a given project. This

---

[1] These facts are largely taken from the Complaint and supplemented by the various pleadings. [Dkt. Nos. 1, 9, 12.]

includes compliance with union work schedules and grievance procedures, paying union wages and benefits, hiring the majority of their workforce through the union, and applying to the union for employment.

EO #69 prohibits the State from entering into or utilizing a PLA or any other agreement that attempts to: control or limit staffing, serve as a single source of employee referrals, designate work assignment, stipulate a specific source of insurance and other benefits, require proprietary training programs or standards, or mandate wage levels (with certain exceptions).  A contractor is not "obligated to become a party to a contract with any Labor Organization" or "be required to observe the terms and conditions" of a PLA.  EO #69 applies to:

> all Public Works Projects for which a construction contract has not yet been entered into by the State, its Departments, its Agencies or any of its Political Subdivisions, unless otherwise prohibited by federal law or regulations.  Further, with respect to all contracts for Public Works Projects which were entered into prior to the date of this Order but where the lowest, responsible and responsive bidder had not yet been selected . . . [action must be taken] to the extent practical and permitted by law, to conform said contracts, related bid specifications, project agreements, and other controlling documents, in order to conform to and implement the provisions of this Order. However, this Order shall not govern any contracts for Public Works Projects that were both entered into and where the lowest, responsible and responsive bidder had been selected prior to the date of this Order.

(alteration added).

There are certain definitions particularly relevant to the matter at hand.  "State Funds" is broadly defined as "any tax payer dollars or other funds of the State," and includes, *inter alia*, "general fund obligations, income taxes, property taxes."  A "Public Owner" is "any person or entity receiving or using State Funds in whole or in part," and includes the State and any of its political subdivisions.  "Political subdivisions" is also expansive and includes cities, counties, school districts, or any other organization that "receives or uses any State

...

Funds." Lastly, "Public Works Project" denotes any building or other project "which is constructed by or under the control of a Public Owner and is paid for in whole or in part with State Funds or funds from any federal source."

On July 19, 2010, Ray Walton, acting in his official capacity as Director of the Iowa Department of Administrative Services ("DAS"), executed a "Project Labor Agreement with Central Iowa Building and Construction Trades Council for the Iowa Veterans Home, Marshalltown, Iowa" (hereinafter "Veterans Home PLA"). The Veterans Home PLA was also executed by representatives of the Central Iowa Building and Construction Trades Council ("CIBCTC") and designated representatives of each of its affiliated local unions.

Pursuant to the terms of the Veterans Home PLA, the State of Iowa is contractually obligated to include the terms of the Veterans Home PLA in the bid specifications for the remaining phases (2, 3, and 4) of the Iowa Veterans Home construction project. This obligation requires the State of Iowa to ensure that any potential contractor will execute and follow the Veterans Home PLA. Article IV Section 3 of the Veterans Home PLA[2] requires contractors to conduct hiring under the job referral systems, if any, that are offered by local

---

[2]The Court assumes that the Iowa River Landing PLA, *infra*, contains provisions largely similar to the Veterans Home PLA. Support for this assumption is found in the Complaint, whereby Plaintiffs cite to the same articles and sections to discuss specific provisions. Plaintiffs did not attach either PLA to its Complaint or Response to the Motion to Dismiss, but the Defendants did attach the Veterans Home PLA to its Motion to Dismiss.

The Court refers to the PLAs because it may consider matters in the public record and "materials that are necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *see also Noble Sys. Corp. v. Alorica Central, L.L.C.*, 543 F.3d 978, 982 (8th Cir. 2008). Documents attached to or incorporated within a complaint are considered part of the pleadings, and a court may look at such documents "for all purposes," including to determine whether a plaintiff has stated a plausible claim for relief. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459-60 (8th Cir. 2010) (citations omitted); *see also Sioux Biochem., Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 791 (N.D. Iowa 2005) (court viewed underlying contractual agreements "as submitted by the parties in support of or resistance to [defendant's] motion to dismiss") (alteration added). Documents not physically attached to a complaint may be considered in a Rule 12(b)(6) motion if "the complaint *refers* to such document; the document is 'central' to plaintiff's claims; and no party questions the authenticity of the document." *Federal Civil Procedure Before Trial*, § 9:212.1(a), at 9-67, 9-68.

union affiliates by providing job opportunities to those employees. Job referral systems maintained by local union affiliates typically initiate job referrals according to an out-of-work list of workers. Pursuant to Article IV Section 5 of the Veterans Home PLA, contractors signatory must use these lists to supplement a designated percentage of the "core employees" the contractor already employs. According to the Plaintiffs, these out-of-work lists predominantly consist of local Iowa workers and the Veterans Home PLA thus benefits Iowa workers. In addition, Article X of the Veterans Home PLA and its appendices provide for certain wage rates and fringe benefit contributions for each trade classification.

According to the Plaintiffs, the Veterans Home PLA was included as part of the bid specifications for Phase 2. All of the bids received on January 6, 2011, were over budget and a contractor was not picked. Phase 2 will be rebid in the Fall of 2011. Awards for Phases 3 and 4 have also not been made.

On September 1, 2010, Robert Donley, acting in his official capacity as Executive Director of the Board of Regents, State of Iowa, executed a "Project Labor Agreement with Cedar Rapids/Iowa City Building and Construction Trades Council for the New Iowa River Landing Satellite Medical Facility" (hereinafter "Iowa River Landing PLA"). The Iowa River Landing was also executed by representatives of the Cedar Rapids/Iowa City Building and Construction Trades Council ("CRICBT") and designated representatives of each of its affiliated unions.

Pursuant to the terms of the Iowa River Landing PLA, the State of Iowa is contractually obligated to include the terms of the Iowa River Landing PLA into the bid specifications for all project work. This obligation also requires the State of Iowa to ensure that any potential contractor will execute and comply with the Iowa River Landing PLA.

After Governor Branstad's issuance of EO #69, all references to PLAs were deleted from bid specifications for the Veterans Home and Iowa River Landing projects. Addendum No. 1 to Phase 3 of the Veterans Home was issued on January 21, 2011, and this deleted all references to the Veterans Home PLA from any and all bid specification documents. On

March 8, 2011, Mike Carroll, the new head of the DAS, informed the president of CIBCTC that provisions for PLAs would not be included in future Veterans Home bid specifications. The DAS received bids on March 10, 2011, under the revised terms of the bid specifications, which the Plaintiffs claim were all over budget. The DAS announced an Intent to Award the contract for Phase 3 on March 16, 2011.

Similarly, Executive Director Donley informed the president of CRICBT on March 11, 2011, that the Iowa River Landing PLA would be removed from the remaining portions of the project for which construction contracts had not yet been awarded. This includes Bid Packages #5 and #7, which involve construction work valued at more than $6.3 million. As a result of deleting the Iowa River Landing PLAs from these bid packages, the original scheduled bids were canceled and rescheduled for April 13, 2011, and March 30, 2011, respectively.

Plaintiffs assert in their Complaint that as a result of the Defendants removing the PLAs from the bid specifications for the Veterans Home and Iowa River Landing projects, workers have been and will continue to be deprived of the benefits of the PLAs. Workers employed on those projects and workers included on out-of-work lists who have been denied employment opportunities, have lost and will continue to lose wages and benefits. Further, workers will be denied the opportunity to negotiate and secure benefits under future PLAs or other agreements falling within the scope of the prohibitions of EO #69.

On the basis of these facts, Plaintiffs allege four counts against Defendants. Count I alleges that EO #69 is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq*. Count II alleges that Plaintiffs' federal rights have been violated under 42 U.S.C. § 1983. Plaintiffs seek injunctive and declaratory relief against the individual defendants sued solely in their official capacity. Plaintiffs also seek attorney's fees pursuant to 42 U.S.C. § 1988. In Count III, Plaintiffs allege breach of contract in removing PLAs from the bid specifications for the Veterans Home project and the Iowa River Landing project. Finally, in Count IV, Plaintiffs allege that Governor Branstad violated the Iowa

State Constitution by improperly performing a legislative function with his prohibition of PLAs in the manner described in EO #69.

Defendants filed this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Defendants assert that, pursuant to the Eleventh Amendment of the United States Constitution, this Court lacks jurisdiction over: (1) all claims against the State of Iowa, the Iowa Department of Administrative Services, and the Board of Regents; and (2) all state law claims against the individual defendants. Because Defendants do not consent to jurisdiction, Plaintiffs conceded this constraint, *supra*, and filed their own motion to dismiss these claims.[3] Defendants also argue that Plaintiffs have failed to state a claim under Counts I and II against the individual defendants. Defendants argue that the state and its officers act in a proprietary capacity, and not a regulatory capacity, by refusing to enter into PLAs. Defendants urge the Court to find that EO #69 is in compliance with the NLRA and the Supremacy Clause of the United States. Finally, the Defendants also assert that Plaintiffs' claim for damages under 42 U.S.C. § 1988 must fail because it is barred by the Eleventh Amendment.

Plaintiffs contend that they have stated a valid claim because EO #69 is "tantamount to regulation" because it attempts to implement a state-wide policy banning PLAs on public projects. Further, Plaintiffs argue that EO #69 is facially invalid and they are entitled to injunctive relief, as well as an order enjoining the individual defendants to reinstate the PLAs that were unlawfully removed pursuant to EO #69.

---

[3]As explained *supra*, the Plaintiffs moved to dismiss the state law claims (Counts III and IV) against the State of Iowa, the Iowa Department of Administrative Services, and the Board of Regents (collectively, "the State"). These defendants are immune from suit in this Court with respect to all claims unless they consent to suit in federal court. "Sovereign immunity principles enforce an important constitutional limitation on the power of the federal courts." *Sossamon v. Texas*, 131 S. Ct. 1651, 1657 (2011) (citing *Pennhurst State Sch. And Hosp. v. Halderman*, 465 U.S. 89, 98 (1984)). "[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State." *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011). Here, the State of Iowa, the Iowa Department of Administrative Services, and the Board of Regents have not consented to this suit and these state law claims must be dismissed. For the same reasons, Plaintiffs cannot sustain a suit against the individual defendants for violations of state law in federal court. *See Quinnett v. Iowa*, 644 F.3d 630, 632 (8th Cir. 2011).

Defendants, in their reply, argue that EO #69 applies to the two state-owned projects in this case, and that the NLRA does not preempt the application of EO #69 to these two projects, or to other projects. Defendants assert that several courts have held that rejecting PLAs can be done on an across-the-board basis, instead of the "ad hoc" basis that Plaintiffs propose. Finally, Defendants assert that Plaintiffs cannot sustain an as-applied or facial challenge to EO #69.

## II. DISCUSSION

To survive a Fed. R. Civ. P. 12(b)(6) motion, the claim "may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The complaint must also "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). While not a "probability requirement," the "plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Id.* When analyzing the adequacy of a complaint's allegations under Rule 12(b)(6), the court must accept as true all of the complaint's factual allegations and view them in the light most favorable to the plaintiff. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint") (citations omitted).

### A. Whether Executive Order #69 is Preempted
### by the National Labor Relations Act

In Count I, Plaintiffs allege that Governor Branstad's EO #69 infringes upon the NLRA and is preempted by the Supremacy Clause to the United States Constitution. Defendants assert that EO #69 is not preempted because the State is acting in a proprietary capacity, and as such, is exempt from the constraints of the NLRA.

The NLRA explicitly allows for PLAs, or "pre-hire agreements" in the construction industry. 29 U.S.C. §§ 158(a), (b), (f). The Supreme Court explained in *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 231 (1993) (*Boston Harbor*), that PLAs are useful in the construction industry because of "the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a longstanding custom of prehire bargaining in the industry." On the other hand, PLAs can be anti-competitive and have the effect of freezing out employees of non-union contractors by limiting the number of their employees they are allowed to use on a project. *See Master Builders of Iowa, Inc. v. Polk County*, 653 N.W.2d 382, 399-400 (Iowa 2002) (Larson, J., dissenting).

Here, through the issuance of EO #69, Governor Branstad supports the latter proposition: that PLAs "impact[] the essence and the spirit of the competitive bidding process" by "chill[ing]" the opportunity to work on state funded projects. The plaintiffs claim that by prohibiting the use of PLAs in all state-funded projects, the State has not engaged in a proprietary function but is regulating an industry. If the State is engaged in a proprietary function, then EO #69 is not preempted by the NLRA. But if EO #69 serves a regulatory purpose, then it is preempted by the NLRA and must be enjoined.

In passing the NLRA, Congress intended to enact comprehensive federal law of labor relations. *Nash v. Florida Indus. Comm'n*, 389 U.S. 235, 238 (1967); 29 U.S.C. § 151. Specifically in reference to the NLRA, the Supreme Court has crafted two distinct preemption principles, *Garmon* and *Machinists* preemption. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748 (1985) (citing *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959); *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976)).

The *Garmon* preemption forbids state and local regulation of activities protected by

9

Sections 7 or 8 of the NLRA.[4] 359 U.S. at 244. This includes any "activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wisconsin Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 286 (1986). Such preemption displaces state jurisdiction over conduct arising "'arguably within the compass of § 7 or § 8 of the Act.'" *Miner v. Local 373*, 513 F.3d 854, 866 n.8 (8th Cir. 2008) (quoting *Williams v. Watkins Motor Lines, Inc.*, 310 F.3d 1070, 1072 (8th Cir. 2002)). The *Machinists* preemption restricts state regulation in areas that Congress intended "to be controlled by the free play of economic forces." 427 U.S. at 140. *Machinists* acts as a safeguard to balance "uncontrolled power of management and labor" in order to advance the respective interests of each, while also "creat[ing] a zone free from all regulations, whether state or federal." *Boston Harbor*, 507 U.S. at 226. As the Supreme Court stated in *Boston Harbor*, "[w]hen we say that the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists*, or for [National Labor Relations Board] jurisdiction, see *Garmon*." *Id.* at 226-27 (alterations added).

The Supreme Court in *Boston Harbor* applied both the *Garmon* and *Machinists* preemption principles in its thorough analysis of the distinction between the government as a regulator and the government as a proprietor. In *Boston Harbor*, an organization representing non-union construction industry employees filed suit to enjoin the Massachusetts Water Resources Authority's ("MWRA") bid specification directing that successful bidders comply with their project labor agreement. 507 U.S. at 221. As a result of a lawsuit brought pursuant to the Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*, the MWRA was required to undertake a cleanup project of Boston Harbor that was expected to cost $6.1 billion over ten years. *Id.* The MWRA permitted its project manager, Kaiser Engineers, Inc., to negotiate pre-hire agreements with the Building and Construction Trades Council ("BCTC") and affiliated organizations in order to "assure labor stability over the life

---

[4]Section 7 governs the rights of employees and Section 8 regulates unfair labor practices. These cross-reference to 29 U.S.C. §§ 157 and 158.

of the project." *Id.* A contractors' association filed a charge with the National Labor Relations Board, alleging that the pre-hire agreements violated the NLRA. *Id.* at 222.

As the *Boston Harbor* Court explained, the *Machinists* preemption is meant to prevent some activities from being regulated. *Id.* at 227. The Court applied *Machinists* in *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 614 (1986) (*Golden State I*), where it held that the City of Los Angeles could not condition renewal of a taxicab franchise on the settlement of a labor dispute. The Court held that the city could not use its "regulatory power of license nonrenewal to restrict Golden State's right to use lawful economic weapons in its dispute with its union." 507 U.S. at 227 (citing *Golden State I*, 475 US. at 615-19). The *Boston Harbor* Court noted in dicta that if instead the city of Los Angeles had purchased the taxicab services in a proprietary function, such as transportation of its own employees, then the city could have conditioned the resolution of the labor dispute upon its purchased use of the taxi company's services. *Id.*

The Court next addressed the *Garmon* preemption principle by looking to the example set forth in *Gould*. In *Gould*, the State of Wisconsin refused to do business with persons who had violated the NLRA three times within the previous five years. The Court noted that the *Garmon* preemption applied in *Gould* because prohibiting people from doing business with the state on the basis of NLRA violations "serves plainly as a means of enforcing the NLRA." 475 U.S. at 287. The state's conduct in *Gould* was regulatory behavior because the state was attempting to "compel conformity with the NLRA," and instead of acting as a "private purchaser of services . . . Wisconsin's debarment scheme is tantamount to regulation." *Id.* at 289.

After parsing the differences between the *Machinists* and *Garmon* approaches to preemption, the Court explained the circumstances under which state involvement would be considered proprietary versus regulatory. The Court noted that it had not fully answered the question in *Gould*, as to whether a state could act "without offending the pre-emption principles of the NLRA when it acts as a proprietor" as opposed to being "tantamount to

11

regulation or policymaking." 507 U.S. at 229. The Court resolved this question by holding that a state's proprietary actions would not be construed as regulatory in nature, explaining that "[p]ermitting the States to participate freely in the marketplace is not only consistent with NLRA pre-emption principles generally but also, in these cases, promotes the legislative goals that animated the passage of the §§ 8(e) and (f) exceptions for the construction industry." *Id.* at 230 (citations omitted). As the Court explained, "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as *purchaser* should be permitted to do the same." *Id.* at 231 (emphasis in original). For by "denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists*." *Id.*

The Court then applied its analysis of the bid specification mandated by the MWRA. It held that the bid specification was "not government regulation and that it is therefore subject to neither *Garmon* nor *Machinists* preemption." *Id.* at 232. The MWRA, as an extension of the government, can act in a proprietary role by including labor agreements as a condition of employment. *Id.* at 233. In requiring labor agreements in its own projects, the MWRA "exemplifies" market forces and does not engage in regulation of the market. *Id.*

Thus, *Boston Harbor* established the seminal test to decide whether the government's action qualifies as proprietary market participation. First, a court must determine whether the challenged funding condition advances or serves a state's proprietary interest in a project. 507 U.S. at 232. Second, a court must determine whether the scope of the funding condition is "specifically tailored" to the proprietary interest. *Id.*

Courts since *Boston Harbor* have applied this test with different results. In *Chamber of Commerce of the United States v. Lockyer*, the Ninth Circuit considered a California statute forbidding employers who received a certain amount of state funds from using those funds to advocate for or against union organizing. 364 F.3d 1154 (9th Cir. 2004). The statute applied to all employers who received state grants in excess of $10,000, and it also

required businesses to undertake separate accounting requirements if they received state funds or entered into a contract with the state for more than $10,000. *Id.* at 1163. The statute affected employers in the use of state funds for any reason and was not specifically tailored to the state financing of projects employing workers who might be unionized. The Ninth Circuit held that the statute was overbroad and regulatory in nature because it was "designed to have a broad social impact, by altering the ability of a wide range of recipients of state money to advocate about union issues." *Id.*

In *Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources, LLC*, the Third Circuit held that the City of Pittsburgh's decision to condition a grant of tax increment financing ("TIF") upon the recipient's acceptance of a labor neutrality agreement was an example of proprietary action. 390 F.3d 206, 207 (3d Cir. 2004). The City passed Ordinance 22 which required contractors and employers hired to staff hospitality operations, where the City of Pittsburgh had a financial or proprietary interest, to be signatory to collective bargaining agreements. *Id.* at 208. These collective bargaining agreements required, *inter alia*, disputes arising under them to be settled by arbitration. *Id.* at 209. The question raised in *Sage* was whether Ordinance 22 was specifically tailored to advance or protect a proprietary financial interest of the City. *Id.* at 216. The court analyzed *Boston Harbor* and concluded that "Ordinance 22 is not unduly broad in promoting and protecting the City's proprietary interest." *Id.* at 217. It noted that the City's "decision to insist that contractors and employers of staff hospitality employees sign no-strike agreements is specifically tailored to protect its proprietary interest in the value of the tax-revenue-generating property." *Id.* The City only required participating contractors to sign the labor agreements for its own projects, and did not extend the requirement to contractors' non-TIF (or City) projects. *Id.* at 218. As a result, "[g]iven [the City's] considerable investment [in the properties] . . . Ordinance 22 is a specifically tailored response to a financial interest." *Id.* (alterations added).

Both parties cite to the contrasting decisions of the District of Columbia Circuit in

*Building and Construction Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), and *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996). Plaintiffs argue that *Reich* definitively establishes that EO #69 is preempted by the NLRA. Defendants assert that *Allbaugh* shows that the State of Iowa is acting in a proprietary capacity.

In *Reich*, the court examined Executive Order No. 12,954 issued by President Clinton. It barred the federal government from contracting with employers who hired permanent replacements during a lawful strike. 74 F.3d at 1338-39. The Court applied *Boston Harbor* to conclude that the Executive Order was "regulatory in character" because it would have a substantial impact on American businesses contracting with the government. *Id.* at 1336. It noted that "[i]t does not seem to us possible to deny that the President's Executive Order seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers." *Id.* at 1337. The court distinguished the broad character of the Executive Order from the "*ad hoc* contracting decision made by the MWRA in seeking to clean up Boston Harbor." *Id.* In its dicta, the court also specifically referred to the earlier Executive Order No. 12,818 (issued by President Bush), that banned government contractors from entering into PLAs, and stated that "we very much doubt the legality" of that order. *Id.* It is this dicta that Plaintiffs rely upon, in their argument that, like Executive Order No. 12,818, EO #69 is too broad to pass muster.

But the Court finds that the analysis of *Boston Harbor* in *Allbaugh* is more on point and is remarkably similar to the facts in this case. President George W. Bush issued Executive Order No. 13,202 establishing that no federal agency or entity that receives federal assistance may require or prohibit contractors from entering into PLAs. 295 F.3d at 30. A labor union specifically challenged the enforcement of the Executive Order against the Woodrow Wilson Bridge Construction Project PLA. *Id.* at 31. The court held that Executive Order No. 13,202 was not regulatory, but rather, permissible proprietary action. *Id.* at 34. This is because "placing a labor-related condition upon [an] award either of a construction

14

contract or of funds to another entity that will award the construction project" is a decision that a private actor would be free to make. *Id.* In addition, the court found no reason to distinguish the application of the Executive Order from government-owned projects versus federally-funded projects:

> First, the Government unquestionably is the proprietor of its own funds, and when it acts to ensure the most effective use of those funds, it is acting in a proprietary capacity. Second, that the Government is a lender to or a benefactor of, rather than the owner of, a project is not inconsistent with its acting just as would a private entity; a private lender or benefactor also would be concerned that its financial backing be used efficiently. In sum, the distinction between federally owned and federally funded projects is not relevant here.

*Id.* at 35. The court also rejected drawing a distinction between case-by-case proprietary decisions and "blanket" or across-the-board proprietary decisions because such an interpretation is too constrained. It specifically rejected the argument that *Reich* stood for the proposition that a "general application" policy would not be permitted because, in that case, the action was held to be regulatory only "because [the Executive Order] disqualified companies from contracting with the Government on the basis of conduct unrelated to any work they were doing for the Government." *Id.* (citing *Reich*, 74 F.3d at 1138). The court continued,

> It is not surprising, therefore, that neither the district court nor the plaintiffs could offer any good explanation why a "blanket rule" – applicable to all government contracts, but not to the non-government contracts of those who do business with the Government – is somehow inconsistent with the action of a proprietor. We agree with the Government that there simply is 'no logical justification' for holding that 'if an executive order establishes a consistent practice regarding the use of PLAs, it is regulatory even though the only decisions governed by the executive order are those that the federal government makes as [a] market participant.'

*Id.* (citation omitted) (alteration in original). The court ultimately found that because the

15

Executive Order "does not address the use of PLAs on projects unrelated to those in which the Government has a proprietary interest, the Executive Order establishes no condition that can be characterized as 'regulatory.'" *Id.* at 36.

Here, the Court finds that EO #69 is not preempted by the NLRA and that it is a proprietary decision for the State of Iowa to prohibit PLAs in state-owned or state-funded projects. The *Garmon* and *Machinists* preemptions are not applicable to the matter at hand because the State of Iowa is not regulating businesses through the issuance of EO #69. The Supreme Court's decision in *Boston Harbor* and the District of Columbia Circuit's decision in *Allbaugh* aptly describe when a government directive is regulatory or proprietary. EO #69 establishes funding conditions that serve the State's proprietary interest in projects. In prohibiting PLAs, the State of Iowa has made a decision that PLAs detract from a competitive bidding environment and that state funds and state projects will benefit from eliminating coercive union tactics. The State, as the proprietor of its construction projects, can make the decision not to pay union wages or operate under union conditions. This is a business decision that does not come into conflict with the NLRA because it is not designed to have a broad social impact, rather, the stated purpose is to administer proprietary projects more efficiently. *Allbaugh*, 295 F.3d at 35; *Sage*, 390 F.3d at 218; *Lockyer*, 364 F.3d at 1163.

The Court also finds that EO #69 is not overbroad because it only concerns state-funded or state-owned projects and does not attempt to regulate or influence other projects. *Contrast Reich*, 74 F.3d at 1337. For example, EO #69 does not state that contractors working for the State of Iowa may not enter into any *other* PLAs. It only prohibits PLAs from state projects or projects that use state funds and this is narrowly-tailored to comply with the requirements of *Boston Harbor.* This approach has been found to be permissible when the state is acting as a market participant, which it is doing here. *Allbaugh*, 295 F.3d at 35. The Court concludes that, as to the Veterans Home PLA and Iowa River Landing PLA, EO #69 must be upheld because it is specifically tailored to serve a proprietary interest

and the State is acting as a market participant. But more broadly, the Court does not find a distinction between applying EO #69 to these two PLAs and an across-the-board application of EO #69 to *all* PLAs. It is the State acting as a market participant each and every time it chooses not to enter into PLAs for any specific project. The Court does not find a difference between Governor Branstad issuing countless Executive Orders each time the State enters into projects (whether state-owned or state-funded) or one Executive Order banning PLAs from every project. If twenty projects in a row were each declared, ad hoc, to prohibit PLAs, the intent and the result would be the same. It would be a de facto "policy" against PLAs. The State is acting as a proprietor to prohibit PLAs and, because the State has the right to do this, it has the right to make this determination in the manner it sees fit.

### B. Whether Plaintiffs' Federal Rights Have Been Violated Under 42 U.S.C. § 1983

Because the Court finds that EO #69 is not preempted by the NLRA, it likewise finds that there has been no violation of federal rights under 42 U.S.C. § 1983 and Plaintiffs' § 1983 claim is without merit.

Upon the foregoing,

IT IS ORDERED that Plaintiffs' Motion to Dismiss [Dkt. No. 13] Counts III and IV without prejudice is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss [Dkt. No. 8] Counts I and II is GRANTED. The clerk shall enter judgment for the Defendants.

DATED this 7th day of September, 2011.

_____
JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA